# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

RECEIVED
BY MAIL
DEC 19 2005
CLERK, US DIST. COURT
ST. PAUL, MN

No. 02-3388

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Michael Alan Mooney, | * | |
| | * | CR 00-365 JMR/FLN |
| Defendant-Appellant. | * | |

Submitted: June 22, 2005
Filed: October 10, 2005

Before LOKEN, Chief Judge, LAY, BRIGHT, WOLLMAN, ARNOLD, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, and BENTON, Circuit Judges.

MURPHY, Circuit Judge.

Michael Alan Mooney was convicted by a jury of eight counts of mail fraud, four counts of securities fraud, and five counts of money laundering. The district court[1] sentenced him to 42 months, and Mooney appealed his conviction and sentence. The issues he raised in respect to his conviction were resolved in the March

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.



SCANNED
DEC 19 2005
U.S. DISTRICT COURT ST. PAUL

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY:

28, 2005 panel opinion affirming his conviction, United States v. Mooney, 401 F.3d 940 (8th Cir. 2005), but the sentencing portion of that opinion was vacated. Supplemental briefing was scheduled to address the impact of United States v. Booker, 125 S. Ct. 738 (2005), and United States v. Pirani, 406 F.3d 543 (8th Cir. 2005) (en banc), and these briefs were submitted by June 22, 2005. Now before the court is Mooney's appeal of his sentence. He argues that the district court miscalculated the gain from his offenses and violated his Sixth Amendment rights by enhancing his guideline sentence without submitting the question of gain to the jury. We affirm.

I.

Mooney was formerly vice president of underwriting for United Healthcare Corporation (United). United is one of the largest health care management service companies in the country, and its stock trades on the New York Stock Exchange. Mooney opened a margin account in 1990 at the brokerage house Recom and then used it solely to invest in United stock. Recom extended him a line of credit equal to half the value of the securities he maintained in the account. If the value of his securities were to fall below half the account's total value, Recom would make a margin call. Mooney would then have to make a deposit to restore equity in the account or Recom could sell assets of his to restore the 50% margin.

As part of United's strategy to acquire health insurance companies, it approached privately owned MetraHealth (Metra) in early 1995 and entered into negotiations with it in February of that year. At that time Metra provided health insurance to more individuals than United, and it also had a substantial indemnity business. If United were to succeed in acquiring Metra, it would become the largest health care services company in the United States. It would have more than 40 million people enrolled in a variety of health care programs, with projected annual revenue of more than $8 billion. Mooney received stock options from time to time

as part of his compensation at United, and on April 13 he exercised his right to purchase 20,000 shares of United stock for $36,000. The market value on that day for that amount of stock was $917,500.

During the 1995 negotiations, United and Metra conducted due diligence inquiries which involved confidential meetings at the headquarters of each company. Mooney had attended many such meetings on behalf of United in the past, and he and other senior representatives of United went to Metra's Virginia headquarters on May 11, 1995 for due diligence meetings. They spent four days looking through Metra's financial records, membership projections, cost data, and confidential Book of Business. United's corporate counsel reminded the participants in the meetings not to trade in stock during the due diligence period and to protect the secrecy of the proceedings by referring to the proposed merger transaction as "Project Fjord" and to Metra as "Musky."

United has a written policy on insider trading which prohibits United employees from trading in its stock in two situations: (1) during the blackout period at the end of each quarter before the United earnings report is released, and (2) when an employee possesses material nonpublic information. The insider trading policy defines material nonpublic information as information that a reasonable investor would use in deciding whether to invest. It also states that information about proposed mergers and acquisitions by United is material. United's policy was frequently published in employee newsletters and mentioned in oral reminders at due diligence meetings.

After Mooney returned from the meetings at Metra's Virginia headquarters, he contacted his stockbroker on May 17, 1995 to sell the 20,000 shares of United common stock he had purchased in April. The sale cleared on May 24, and Mooney used part of the $775,500 proceeds to purchase call options in United stock. The call options were purchased between May 24 and June 14 for a total price of $258,283.03.

They gave him the right to buy a total of 40,000 shares of United stock at $35 a share in the following months of September, December, and January. Both the sale of his United shares and his purchases of the United call options occurred before the end of the due diligence period in the Metra transaction.

Mooney subsequently sold his call options at a profit.[2] On July 14, 1995 he sold the September options, and early in October he sold the December and January options. His total return on these sales was $532,482.49, and between August 3 and November 20, 1995 he deposited $428,000 into an account he had at Firstar Bank. These deposits were made by five checks drawn on his account at Recom Securities.[3]

The first media mention of the acquisition appeared on June 21, 1995 in the New York Times, which reported that United was in advanced discussions with Metra. United issued a press release on the same day, confirming the ongoing discussions. The daily volume of trade in United shares increased markedly, and the stock price rose 5%. On June 22 the Wall Street Journal reported speculation about United's approaching acquisition of Metra, and United common stock rose another 6%. Then on June 26 United announced its agreement to acquire Metra for $1.65 billion in cash and stock. On June 20, the day before the first national media story, United stock had traded at $40.125. By July 15 the price was $44.50 a share, and by October 5 it was over $49.00.

---

[2]The purchase and sale prices of Mooney's options to buy United stock in the three future months are shown below:

| Options for | Bought | Sold | |
|---|---|---|---|
| September | $63,004.75 (June 6) | $94,536.52 (July 14) | |
| December | $81,800.83 (June 14) | $139,298.57 (October 4) | |
| January | $113,477.45 (May 24, 26) | $298,647.40 (October 5) | |
| | $258,283.03 | $532,482.49 | (+$274,199.46) |

[3]Mooney deposited $138,000 on August 3; $70,000 on August 9; $20,000 on October 23; $100,000 on November 3; and $100,000 on November 20.

Shortly after the public announcement of United's acquisition of Metra, stock market surveillance officials notified the Securities and Exchange Commission (SEC) about bullish positions taken in United call options prior to the announcement of the acquisition. The SEC asked United to investigate whether Mooney had engaged in prohibited securities trading. Mooney denied to United's corporate counsel that he had done so, but the SEC filed a civil action against him on August 2, 1999. It alleged that Mooney had purchased call options while he had material nonpublic information regarding United's plan to acquire Metra. The SEC sought an injunction, disgorgement of Mooney's gains, and a civil penalty. Shortly thereafter on August 9, United suspended Mooney for violating its insider trading policy. He later resigned. The SEC's civil action was stayed after he was indicted in this case.

II.

The second superceding indictment alleged that Mooney knowingly devised and engaged in a scheme to defraud United and its shareholders through his May sale of United common stock and his subsequent purchase and sale of United call options, all while in possession of material nonpublic information concerning United's negotiations to acquire Metra. The indictment charged Mooney with eight counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; four counts of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a), and 17 C.F.R. § 240.10b-5; and five counts of money laundering in violation of 18 U.S.C. § 1957. The mail fraud counts referenced eight separate mailings of confirmation slips, for his May 17 sale of United common stock and for his subsequent call option transactions. The securities fraud counts covered his four separate purchases of call options. The money laundering counts were based on his deposits of five checks from Recom into his Firstar Bank account during August, October, and November 1995; the indictment alleged that these funds were derived from his securities and mail fraud.

Mooney was found guilty by a jury on all counts and required to forfeit $70,000. Mooney was sentenced on August 21, 2002 under the then prevailing mandatory guideline system. Because the federal sentencing guidelines in effect in 2002 would have resulted in a higher sentencing range for the amount of gain found to have resulted from his offenses, the district court applied the 1994 guidelines. See United States Sentencing Guidelines Manual [U.S.S.G.] § 1B1.11(b)(1). Section 2B1.4, the guideline at issue in this case, is identical in both versions except for the use of gender neutral language in 2002, and Mooney does not challenge the court's use of the 1994 manual.

The district court applied the guideline grouping rules, which call for the grouping of offenses which involve substantially the same harm. See U.S.S.G. § 3D1.3. Mooney's securities and mail fraud convictions were grouped under U.S.S.G. §§ 3D1.2(b) and (d) since they involved the same criminal objective. They were then grouped with his convictions for laundering the fraudulent proceeds. See U.S.S.G. § 3D1.2(c). Since the money laundering convictions had the highest offense level of the grouped offenses, they supplied the base offense level of 17. See U.S.S.G. § 3D1.3(a). Two levels were then added for Mooney's knowledge that the proceeds were from a fraudulent scheme. See U.S.S.G. § 2S1.2(b)(1)(B) (1994).

The final adjustment to Mooney's base offense level was an enhancement of two levels for engaging in monetary transactions involving between $200,000 and $350,000 in illegal proceeds. See U.S.S.G. §§ 2S1.1(b)(2)(C), 2S1.2(b)(2) (1994). The illegal proceeds involved in his money laundering were those derived from his insider trading offenses, and the district court found the gain from those offenses to be $274,199.46 under U.S.S.G. § 2B1.4. With a total offense level of 21 and a criminal history score of I, Mooney's sentencing range was 37 - 46 months. The court sentenced him in the middle of the range to 42 months and a $150,000 fine. Mooney's motion for a new trial or judgment of acquittal was denied at the sentencing hearing.

III.

Mooney appealed from the judgment, alleging insufficient evidence, abuse of discretion in an evidentiary ruling, and sentencing error; all of the issues related to his conviction were resolved in the panel opinion of March 28, 2005. His original sentencing argument focused solely on the application of the guideline sentencing enhancement for the amount the district court found to be the gain resulting from his offenses. See U.S.S.G. § 2B1.4. He contends that the district court erred in its interpretation of § 2B1.4 and in its finding that the gain from his offenses was $274,199.46, the amount Mooney realized by the sale of his United call options for $532,482.49 after purchasing them for $257,283.03. Mooney asserts that the gain from his insider trading was much less. After oral argument on Mooney's appeal, the Supreme Court decided Blakely v. Washington, 124 S. Ct. 2531 (2004), and Mooney then invoked the Sixth Amendment in a motion for supplemental briefing.

A.

The district court found under U.S.S.G. § 2B1.4 that the gain resulting from Mooney's offenses was the total amount he gained from his illegal purchase and sale of United call options, but Mooney argues his gain should not be determined from the proceeds he received on sale of the options. Mooney argues that the sentencing guideline term "gain resulting from the offense" in § 2B1.4 is not clear and that a market absorption approach should be borrowed from civil insider trading cases to interpret the guideline. Rather than focusing on the commentary to the guideline, he relies on SEC v. MacDonald, 699 F.2d 47, 53-55 (1st Cir. 1983) (en banc), a civil case holding that defrauded sellers could recover the amount they lost before they could have reasonably obtained access to the material nonpublic information. This theory of recovery has been characterized as solely remedial in nature in contrast to criminal punishment. Id. at 54; see also id. at 55 (Coffin, C.J., dissenting); accord United States v. Perry, 152 F.3d 900, 903-04 (8th Cir. 1998) (disgorgement is a civil

sanction serving nonpunitive goals). Mooney urges that we apply in this criminal case a disgorgement remedy similar to that sought in the SEC's civil case against him, a case which was stayed after he was charged with criminal fraud and money laundering.

Mooney claims that the market would have reasonably absorbed his inside information by June 28, just two days after United announced its Metra acquisition, and that the information would have been reflected in the market value of his call options on that date. His briefing put that value at $309,750,[4] from which he subtracted the purchase price of $258,283.03 to arrive at a gain figure of $50,467.47. The proceeds of the sales in July and October should not be a factor he says because the sales occurred after June 28, his estimated date for absorption of the inside information into the market. His proposed gain figure would result in a guideline range of 24 - 30 months.

The government responds that the appropriate focus is on the amount of gain which Mooney realized from his fraudulent transactions. It notes that the official commentary for the insider trading guideline expressly disapproves of any attempt to measure the severity of the offense in terms of victim losses, and it says that different standards are intended for the criminal sentencing guidelines than for civil disgorgement actions. In the civil context the amount to be disgorged is limited to victim losses, for using total gain could result in an unjust windfall for private victims. The public interest that is served by sentencing criminal defendants has broader goals. The government also points out that Mooney's proposed standard to measure gain is inherently speculative and would require the sentencing court to identify the point at which material nonpublic information is fully assimilated by the market. That would involve extensive factfinding, and in the present case it would

[4]This appears to be a typographical error; we assume $308,750 is intended.

be difficult to say when, if ever, the market had fully assimilated all of the nonpublic information Mooney possessed.

In interpreting the guidelines, we start with the plain language of the guideline itself. See United States v. Gonzalez-Lopez, 335 F.3d 793, 797 (8th Cir. 2003). Section 2B1.4 and its phrase "gain resulting from the offense" are simple and straightforward. The guideline refers to the defendant's gain, not to market gain, and it ties gain to the defendant's offense. It speaks of gain that has resulted, not of potential gain. The guideline does not say "the gain in market value that has resulted from the offense"; such a phrase might support Mooney's theory, but that is not the language used. Moreover, any question about the guideline's meaning is decisively resolved by the authoritative definition provided in the commentary to § 2B1.4.

The official commentary to § 2B1.4 makes the meaning of the guideline very clear. The commentary defines gain resulting from insider trading in this way:

> This guideline applies to certain violations of Rule 10b-5 that are commonly referred to as "insider trading." Insider trading is treated essentially as a sophisticated fraud. Because the victims and their losses are difficult if not impossible to identify, the gain, i.e., the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information, is employed instead of the victims' losses.

U.S.S.G. § 2B1.4, cmt. background (2002) (emphasis added). As this commentary succinctly points out, the guideline applies to insider trading offenses under Rule 10b-5 and by gain it means "the total increase in value realized through trading[5] in securities." (emphasis added).

[5] In discussing the "gain resulting from the offense" the dissent focuses on the purchase of securities without also considering the sales involved in the trading. Under U.S.S.G. § 2B1.4 the defendant's gain is not dependent "on the gyrations of the stock market" as the dissent suggests; it is the inside trader who chooses the timing of his transactions – his purchases as well as his sales.

In explaining what is meant by the defendant's gain and why it is used for sentencing inside trading offenses, the commentary specifically rejects using victim losses in the calculation. The guideline employs the concept of gain resulting from the offense as an alternative measure of loss because of the difficulty of ascertaining the victims and their losses for such offenses. See U.S.S.G. §§ 2B1.1 cmt. n.2(B), 2B1.4 cmt. background. It thus rejects the kind of remedy used in MacDonald and the civil securities laws which are based on victim losses rather than the defendant's gain.[6]

In defining gain as "the total increase in value realized through trading in securities by the defendant" (emphasis added), the commentary uses common words with widely understood meanings. Words are to be taken in their ordinary meaning unless they are technical terms or words of art. Cf. Salinas v. United States, 522 U.S. 52, 63 (1997) ("When Congress uses well-settled terminology of criminal law, its words are presumed to have their ordinary meaning and definition."). There is nothing difficult about the terms "total increase in value" or "trading in securities,"and in the context of securities transactions realize means to convert securities or paper money into cash. See Oxford English Dictionary (2d ed. 1989). The word realize is commonly used to mean "to bring in (a sum) as profit by sale," see American Heritage Dictionary (4th ed. 2000), and "to convert into actual money;

[6]In addition to MacDonald, the dissent cites a Supreme Court case in which Justice Breyer explains that the purpose of the civil market absorption theory is to allow injured parties to recover their losses. Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1633 (2005). Criminal prosecutions for violations of securities law are different, however, for "the victims and their losses are difficult if not impossible to identify" as the guideline commentary points out. U.S.S.G. § 2B1.4, cmt background (2002). The focus in a case applying § 2B1.4 is properly on "the total increase in value realized through trading in securities." United States v. O. Cherif, 943 F.2d 692, 702 (7th Cir. 1991). Also inapposite is Mayle v. Felix, 125 S. Ct. 2562, 2569 (2005), a habeas case to which the Federal Rules of Civil Procedure specifically apply.

as, to realize assets." See Webster's Revised Unabridged Dictionary (1998). The ordinary meaning of the word is also used in the tax context where to realize a gain in the value of property, the taxpayer "must engage in a 'sale or other disposition of [the] property.'" Cottage Sav. Ass'n v. Comm'r, 499 U.S. 554, 559 (1991) (citing Treas. Reg. § 1001(a)).

By use of the word realized, the commentary makes clear that gain is the total profit actually made from a defendant's illegal securities transactions. As applied to this case, it means that the gain resulting from Mooney's offenses was the amount he actually realized by his trading in call options while he had material inside information. In other words, his gain was the profit he realized when he received $532,482.49 for sale of the call options he had purchased for $258,283.03.

As the Supreme Court explained in Stinson v. United States, 508 U.S. 36, 44 (1993), the commentary accompanying the guidelines not only explains them, but it "provides concrete guidance as to how even unambiguous guidelines are to be applied in practice." The commentary is "an authoritative guide to the meaning" of a guideline, id. at 42 (citing Williams v. United States, 503 U.S. 193, 201 (1992)), and the "failure to follow interpretive and explanatory commentary could result in reversible error." Id. at 47. Even though the guidelines are no longer mandatory, Booker requires federal courts to start the sentencing process by calculating a guideline sentence before considering other statutory factors. See Booker, 125 S. Ct. at 767; see also United States v. Patient Transfer Service, Inc., 413 F.3d 734, 743 (8th Cir. 2005). The commentary retains its value in that exercise, for its purpose is to interpret the guidelines and to assist courts in their application. See U.S.S.G. § 1B1.7; see also United States v. Hendricks, 171 F.3d 1184, 1186 (8th Cir. 1999). It also helps achieve consistent application of the guidelines so that sentencing disparity is avoided. See 18 U.S.C. § 3553.

Mooney's civil law theory should not be substituted for the guidance of the commentary, and he cites no support in the guidelines or in judicial decisions for incorporating a civil law standard into the interpretation of a sentencing guideline. Since the governing guideline does not measure gain by increase in unrealized value, Mooney cannot prevail with his argument that his gain should be interpreted to be the paper increase in the value of his call options as of June 28. There are good policy reasons for the approach taken by the Sentencing Commission. The use of actual sales to calculate gain provides a clear and coherent brightline rule, eliminating the need for extensive factfinding to try to determine when the market has absorbed nonpublic information. See MacDonald, 725 F.2d at 11 n.2 ("[D]eterminations of this type are more an art than a science, dependent upon a mix of factors for which there are no precise standards or guidelines.").

Imprecise standards are particularly inappropriate in the criminal context, and Mooney's approach would be especially difficult in this case. Mooney's use of June 28 as the date he claims the market would have absorbed the inside information is most problematic given the evidence in the record. Because Metra was privately held and much information about it was not publicly available, it is questionable how quickly the stock market could learn and absorb material information about the value of United's acquisition.[7]

The focus in § 2B1.4 on the increase in value realized by the defendant's trades provides a simple, accurate, and predictable rule for judges to apply and follows the congressional mandate that sentences reflect the seriousness of the offense. See 18

[7]Regulatory approval for the $1.65 billion acquisition was not obtained until September 29, the acquisition was not completed until October 3, 1995, and market analysis of the acquisition continued into the fall of 1995. Paine Webber released its report "Implications of the MetraHealth Acquisition, Corporate Metamorphosis," in August, and Piper Jaffray issued "Reshaping the Delivery of Healthcare in America— An Analysis of the MetraHealth Acquisition" in October 1995.

U.S.C. § 3553; 28 U.S.C. § 991. The rule is also consistent with the guideline commentary. See Stinson, 508 U.S. at 44. We conclude that the district court correctly interpreted and applied § 2B1.4 of the guidelines.

B.

Mooney also makes an additional argument that he actually made no gain from his offenses. His zero gain theory is based on the argument that he sold the 20,000 shares of United stock on May 17 because he had received a margin call rather than because of a fraudulent scheme, that the margin call forced him to sell the shares at a lower price than their market value on April 13 when he had exercised his employee options to purchase the stock, and that the difference in market value on those dates should have been deducted from the profit he made through his purchase and sale of call options. By substituting his gain figure of $50,467.47 for the district court's finding that he gained $274,199.46 by his insider trading, and then deducting the $142,000 difference in market value of United stock on the two dates, he arrives at a zero gain and a sentencing range of 8 - 14 months.

Mooney's zero gain theory is without foundation for it lacks factual support in the record. He did not lose $142,000 by his sale of the 20,000 shares. He actually made a large profit on the sale. He sold the 20,000 shares on May 17 for $775,500, after paying only $36,000 for them by exercising his employee options on April 13. He did not have to pay the market price for his shares, and he did not sell them when their market value was $917,500. He sold the shares after the Virginia meetings at Metra were concluded, at a time when their market value was lower than in April. The evidence does not support Mooney's contention that he was forced to sell his stock in response to a margin call. The evidence showed that Mooney made arrangements to sell the 20,000 shares as soon as he returned from the Metra due diligence meetings, that his Recom account had no margin problem at that time, and that he never received a margin call. The record also showed that as soon as his sale

of the 20,000 shares cleared on May 24, he began to purchase United call options with the proceeds of the sale. There was more than sufficient evidence from which the trier of fact could find that he sold his stock in order to carry out his fraudulent scheme – to profit from transactions in United call options by using insider information.

Mooney cites no authority to support his theory that he should be credited with an unrealized loss, and the guidelines do not provide for any such credit. Section 2B1.4 focuses on realized value actually gained by the defendant through insider trading, not on differences in market value that did not result in actual gain or loss. In insider trading a defendant's gain from the offense is used in the guidelines to approximate victim losses, and costs to carry out the defendant's fraudulent scheme have no effect on the amount lost by market victims. Furthermore, the law does not favor crediting a defendant for the costs involved in his fraudulent scheme. See United States v. Whatley, 133 F.3d 601, 606 (8th Cir. 1998) ("[W]e are not inclined to allow the defendants a profit for defrauding people or a credit for money spent perpetuating a fraud."); accord United States v. Frank, 354 F.3d 910, 928 (8th Cir. 2004); United States v. Blitz, 151 F.3d 1002, 1012 (9th Cir. 1998). The district court did not err by declining to make the requested deduction.

C.

After Blakely was decided and while Mooney's appeal was still pending, he raised the argument that his Sixth Amendment rights had been violated by the court finding the amount of gain from his offenses rather than the jury. The majority of the hearing panel concluded without additional briefing that under Blakely the federal sentencing guidelines were unconstitutional. See United States v. Mooney, No. 02-3388, slip op. (8th Cir. July 23, 2004), vacated by the court en banc Aug. 6, 2004. Subsequently the Supreme Court held in Booker that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum

authorized by the facts established by . . . a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S. Ct. at 756. In the remedial portion of its opinion, however, the Court held that the federal guidelines could be constitutionally applied if treated as advisory rather than mandatory, id. at 757, that the guidelines must be consulted and taken into account at sentencing, and that sentencing decisions are to be reviewed for unreasonableness. See id. at 767. Courts were advised to apply "ordinary prudential doctrines" in applying the Booker holdings, id. at 769, and in Pirani we addressed the appropriate methodology for plain error review in cases with Sixth Amendment sentencing errors. 406 F.3d at 543. With these precedents in mind, we requested supplemental briefing from Mooney and the government on their application to this case.

Mooney argues in his supplemental briefing that he preserved his Sixth Amendment issue in the district court by objecting to the amount which the court found for his gain and by objecting to an alleged inconsistency between its findings with respect to money laundering and the jury verdict. But even if he did forfeit the issue in the district court, his sentence should be reversed under plain error review he says. He contends there is a reasonable likelihood that the district court would impose a lower sentence if his case were remanded, noting that it finally granted his motion for release pending appeal at the end of 2004 while awaiting the Supreme Court's decision in Booker. The government contends that Mooney forfeited his Sixth Amendment argument by not raising it in the district court and that nothing in the record indicates that the court would have imposed a lower sentence had it treated the guidelines as advisory.

To have preserved a Sixth Amendment claim of sentencing error for appellate review, Mooney would have had to request at trial that the question of his gain be submitted to the jury, argue that the guidelines were unconstitutional, or contend that the sentencing procedures violated Blakely or Apprendi v. New Jersey, 530 U.S. 466 (2000). Pirani, 406 F.3d at 549. Sixth Amendment objections not made during trial

or at sentencing have been forfeited. United States v. Magallanez, 408 F.3d 672, 683 (10th Cir. 2005); see also United States v. Head, 407 F.3d 925, 930 (8th Cir. 2005). The first time Mooney raised a Sixth Amendment argument to the district court was during the pendency of his appeal, after his motion for release pending appeal was remanded almost three years after his conviction on October 30, 2001 and two years after his sentencing on August 21, 2002. Significantly, Mooney acknowledged in his fourth motion for release that he had not "directly raise[d] an Apprendi or Blakely issue in the district court" and that plain error was the appropriate standard of review of his sentence.

Although Mooney claims in his most recent briefing that he did preserve his constitutional argument, he has not shown that he framed any of his objections at trial or at sentencing in terms of the Sixth Amendment or Apprendi. Only those arguments which particularly and unmistakably invoke the defendant's constitutional rights are preserved as a Booker claim, see Pirani, 406 F.3d at 549, and Mooney's arguments to the trial court did not. His citation to Blakely two years after his sentencing, in a motion for release pending appeal, did not preserve a Sixth Amendment issue. Since Mooney forfeited his constitutional argument by not raising it at trial or at sentencing, our review is for plain error. Id.

We will remand for resentencing only if an appellant establishes plain error under the test of United States v. Olano, 507 U.S. 725 (1993). As the Supreme Court articulated in Johnson v. United States, 520 U.S. 461, 466-67 (1997), there is plain error under Olano where there is (1) error, (2) that is plain, that (3) "affects substantial rights," and that (4) "seriously affects the fairness, integrity, or public reputation of judicial proceedings." There is no dispute here that the district court committed error that is plain when it sentenced Mooney under the mandatory guideline system. The question is whether Mooney has demonstrated that his "substantial rights" were affected, which requires showing a reasonable probability that the district court would

have imposed a different sentence had it treated the guidelines as advisory instead of mandatory. Pirani, 406 F.3d at 552-53.

There is no suggestion in this record that the district court felt frustrated or unduly constrained in sentencing Mooney or that it considered his sentence under the mandatory guideline system to be unreasonable. See id. at 553 n.6. The district court's decision to sentence Mooney in the middle of the guideline range and to deny his motion for a downward departure are evidence that it found his guidelines sentence appropriate under all the circumstances. See United States v. Noe, 411 F.3d 878, 888 (8th Cir. 2005) ("That the district court imposed sentences well in excess of the minimum guidelines range forecloses any plausible contention that a merely advisory guidelines regime would probably have resulted in lesser sentences."). Moreover, the district court expressed explicit satisfaction with the sentence by commenting at the sentencing hearing that it had denied his downward departure motion because Mooney's conduct "falls right smack in the middle of the heartland of fraud" and by stating that "the sentence which I have imposed I believe comports with the statutory objectives at 18 United States Code, Section 3553." Mooney has not met his burden of showing a reasonable probability that the district court would have imposed a different sentence under an advisory guideline system and thus has not established plain error. We conclude that Mooney is not entitled to resentencing.

IV.

Mooney has had repeated judicial consideration of his appellate issues over some two years, and we conclude that he has raised no issue which entitles him to relief, either in respect to his conviction or his sentence. The issues relating to his conviction having been previously decided, we have now fully considered his sentencing issues. We conclude that the district court nether misinterpreted nor misapplied the sentencing guideline on the gain resulting from Mooney's offenses, that Mooney forfeited his Sixth Amendment sentencing issue in the district court and

has not shown plain error, and that the sentence imposed by the district court was not unreasonable under all the circumstances. The judgment of the district court is therefore affirmed in all respects.

BYE, Circuit Judge, concurring in part and joining in the dissent in part.

I applaud Judge Murphy's excellent work on behalf of the en banc court in this difficult case. After much deliberation, however, I am persuaded by Judge Bright's dissent as its reasoning appears to more effectively ensure against disparate sentencing for defendants convicted of identical offenses. United States v. Jackson, 959 F.2d 81, 83 (8th Cir. 1992) ("The intent of the Sentencing Guidelines . . . is clear: to avoid unwarranted sentencing disparities among similarly situated defendants."). While mindful of the strong arguments advanced by the majority, I am convinced § 2B1.4's use of the term "gain" was not intended to subject defendants facing a loss of liberty to an unpredictable and erratic sentencing scheme driven by so fluid a marker as stock prices. Thus, I join Judge Bright's dissent from the court's interpretation of § 2B1.4. In all other respects, I concur in the majority's opinion.

BRIGHT, Circuit Judge, with whom LAY, Circuit Judge, joins, dissenting.

**I.**

The court took this case en banc to review a single issue: Whether Mooney's sentence should be remanded to the district court for further proceedings in light of United States v. Booker, 125 S.Ct. 738 (2005).

I dissent from the court's interpretation of section 2B1.4 of the federal sentencing guidelines. I dissent from the court's application of plain error review in the context of Booker error, and I urge the Supreme Court to resolve the circuits' split on this issue, to eliminate the geographic crazyquilt by which many criminal

defendants, sentenced for similar conduct and crimes, receive dissimilar appellate treatment under Booker and, in many cases, disparate sentences.

I add a further comment relating to the sentencing decision by the majority. The necessity of future proceedings in the district court – whatever decision that court may make – renders unnecessary and inconsequential this court's discussion in this case relating to the sentence. The district court, by its November 30 order,[8] appears to have retained jurisdiction to alter Mooney's sentence. Thus, when Mooney's appeal is complete, the district court may conduct further proceedings concerning Mooney's sentence. If the district court, pursuant to the provisions in its November 30 order, leaves the sentence as originally imposed or if the district court reduces the sentence, the opinion of the en banc court will stand for naught.

With these comments, I nevertheless address and dissent from the majority opinion.

**II.**

**A.**

The opinion for the court is at pains to explain that the term "gain resulting from the offense" in USSG § 2B1.4 envisions that the punishment depends on the gyrations of the stock market. I dissent from the court's decision on this point. We

---

[8]The district court's order reads, in pertinent part:

> The defendant Michael Alan Mooney is hereby ordered immediately released from the custody of the United States Bureau of Prisons. Mr. Mooney's release shall last until disposition of his direct appeal to the United States Court of Appeals in No. 02-3388 and until this Court issues a further order concerning Mr. Mooney's sentence following disposition of the appeal, all pursuant to 18 U.S.C. § 3143(b).

cannot know what the "gain resulting from the offense" is, without first knowing what "the offense" is. We must look to the statutes and regulations to find this out. Those authorities do not support the court's opinion.[9]

Of the four statutes Mooney was convicted under, only one is referenced to USSG § 2B1.4. That statute is 15 U.S.C. § 78j(b) (as elaborated by 17 C.F.R. § 240.10b-5).[10] See USSG App. A. "The offense" is not the purchase of stock itself,

---

[9]The opinion for the court correctly observes that the commentary to USSG § 2B1.4 appears to define "gain" as "the total increase in value realized through trading in securities by the defendant." Slip op. at 9. See also USSG § 2B1.4, cmt. background (2002). As the commentary explains, in insider trading cases "gain" is the relevant concept, because it would be unworkable to try to identify specific victims and their losses.

But of course it is not enough to define "gain." We then must know what "the offense" is, because the guideline does not look to "gain" simply, but to the "gain resulting from the offense." Indeed, simply to take the definition of "gain" without limiting it to gain "resulting from the offense" would lead to absurd results. It is not *all* the defendant's stock gains – over an entire lifetime of stock trading, perhaps – that counts, but only the stock gains "resulting from the offense."

The guideline commentary does not define or discuss the key words here: "resulting from the offense." Fortunately, however, the plain language of the statute makes it clear what "the offense" is.

[10]15 U.S.C. § 78j states:

> It shall be unlawful for any person, directly or indirectly . . .–
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security . . . any *manipulative or deceptive device or contrivance* in contravention of such rules and regulations as the Commission may prescribe . . . ." (Emphasis added).

but the *use of a manipulative or deceptive contrivance in connection with* the purchase. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The offense inheres not in the purchase itself, but in any deception that may be entwined with the purchase.

There in the plain language of the statute: The offense is not the purchase, but the deception. The "gain resulting from the offense" is not the gain resulting from the purchase. It is, rather, the gain resulting from the deception.

The gain resulting from the deception stops when the deception stops, though there may be later gain (or loss) as the stock market gyrates along, unmolested by any deception. If someone buys stock illegally on the basis of insider knowledge, there may be an increase in the stock's value when the insider knowledge is made public. That increase is illicit, resulting from a kind of deception to the other buyers and sellers of the stock. After the market adjusts to this information and the deception is ended, the value of the stock will, of course, continue to fluctuate according to the ordinary, legitimate vagaries of the market – with no deception – and thus, no offense under 15 U.S.C. § 78j – involved. Thus, if the person holds the stock for another five years after the insider knowledge has been made public, the value of the stock will continue to rise or fall regardless of the prior deception.

---

17 C.F.R. § 240.10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**B.**

Even if the plain language of the statute did not clearly tell us what "the gain resulting from the offense" is, the interpretation the court adopts would be unreasonable. The reasonableness of an application of ambiguous Guidelines language depends in many respects on whether it would promote the uniformity of sentences for similarly situated defendants. Cf. United States v. Booker, 125 S.Ct. 738, 761 (2005) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity. That uniformity does not consist simply of similar sentences for those convicted of violations of the same statute .... It consists, more importantly, of similar relationships between sentences and real conduct, ....")

The court's interpretation of USSG § 2B1.4 does not promote uniformity. To the contrary, it could result in unequal sentences for equal crimes. I give an example below.

Assume that Larry, Moe, and Curly are executive officers of a corporation with insider knowledge. They each separately, at the same time, with the same insider's knowledge, buy 1,000 shares of stock at a price of five dollars per share. Four weeks later, the insider knowledge is made public, and after the fifth week that knowledge has been absorbed by the market and the stock price reflects that knowledge. On the day the knowledge can be said to have been absorbed by the market, the stock price has risen from five dollars per share to fifteen dollars per share.

On that day, Larry sells the 1,000 shares he bought, making $10,000–all of which is illicit gain, arising entirely from his exploitation of insider knowledge. Moe and Curly, whose portfolios on that day reflected the same $10,000 increase in value, each hang on to their 1,000 shares. Three months later, the stock price has soared to fifty dollars per share. Moe sells, pocketing total capital gains of $45,000–including

a $10,000 increase from Moe's exploitation of insider knowledge, and a $35,000 increase owing to the ordinary vagaries of the market, untainted by any deception. Curly does not sell for a substantial period of time. Six months later, the market crashes, the stock price plummets, and Curly sells out at two dollars per share.

Larry, Moe, and Curly committed the same crime, with the same effect on the market. If the "gain resulting from the offense" were the gain from the deception, the Guidelines would suggest the same increase (of two levels) over the base offense level for Larry, Moe, and Curly. See USSG § 2B1.4; § 2B1.1(b). On the court's interpretation, however, Larry would receive a two-level increase, for a $10,000 gain, Moe a six-level increase for a $45,000 gain, and Curly no increase at all, because he lost money on the purchase. See id. If these increases were applied to a base offense level of 17 for a defendant with a criminal history category of I, as in Mooney's case, they would translate into additional minimum prison time of six months in Larry's case, a year and ten months in Moe's case, and no additional time in Curly's case. As I have noted above, the court's interpretation means unequal justice for equal crimes.

As the Supreme Court has recently said, the basic purpose of the Guidelines "was to move the sentencing system in the direction of increased uniformity," a uniformity that consists of "similar relationships between sentences and real conduct[.]" Booker, 125 S.Ct. at 761. It is unreasonable to apply the Guidelines in a way that would lead to such disparate sentences for similarly situated defendants whose real conduct was identical. Such an application would create a through-the-looking-glass inversion of the Guidelines – advising unequal sentences for identical crimes – defeating the chief purpose of the Guidelines.[11]

[11]In a thoughtful opinion deciding a civil securities fraud matter, the First Circuit, en banc, considered similar hypotheticals and reached a similar conclusion:

> Granted that it may add to the deterrent effect of the [Securities Exchange] Act every time the [Securities and Exchange] Commission

The majority view cannot and should not be the rule. The Supreme Court recently indicated in a civil stock deception case that the ups and downs of the stock market are not causative of loss to the deceived parties. In Dura Pharmaceuticals v. Broudo, 125 S.Ct. 1627, 1632 (2005), the opinion by Justice Breyer for a unanimous court stated:

> When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,

---

> conceives of a ground for assessing greater liability, to charge one class of insiders more than others who had committed precisely the same fraudulent act does not seem to us to meet any definition of "equitable."

SEC v. MacDonald, 699 F.2d 47, 54 (1st Cir. 1983) (en banc).

The majority opinion states that MacDonald has nothing to say to us, because it was a civil case and this is a criminal case. Slip op. at 11. It is surely true that the MacDonald court was not interpreting the "gain resulting from the offense" language in the sentencing guidelines. The court was, however, considering how to quantify the "profits and interest wrongfully obtained" from insider trading. See MacDonald, at 54 (quoting SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978)).

The "profits and interest wrongfully obtained" from insider trading clearly bears a close relationship to the "gain resulting from the offense" of insider trading. The majority opinion suggests, however, that the quantity of such gain or profits may be different when it goes to the amount of money that must be disgorged in a civil case than when it goes to the amount of time that must be served in prison in a criminal case. Slip op. at 7-8. The majority opinion does not explain this point. I do not understand how the gain or profits from a single act of insider trading could be, say, $1,000.00 when the Securities and Exchange Commission sues the perpetrator, but be $5,000.00 when the Department of Justice prosecutes the perpetrator. The difference between civil and criminal cases is not so great as that. Cf. Mayle v. Felix, 125 S.Ct. 2562, 2570-72 (2005)(interpreting language in a criminal context with reference to interpretations of the same language in a civil context).

> which taken separately or together account for some or all of that lower price. (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been–a claim we do not consider here.)

The terms gain and loss are ordinary words with meanings that are similar whether they are used in a civil or a criminal context. If those gains are not a causative factor in a civil fraud or deception case, that obvious concept should not apply in the criminal case, where the stakes for a defendant relate not to money but to freedom from incarceration.

The majority opinion rejects the application of the civil cases of MacDonald and Dura to the present criminal case – yet, cites no caselaw, civil or criminal, to support its theory of sentencing.[12]

**III.**

I join Judges Heaney, Arnold, Bye, and Smith in dissenting from the court's test, announced in United States v. Pirani, 406 F.3d 543 (8th Cir. 2005), for conducting plain error review of sentences that are erroneous under Booker. Id. at 555-562 (Heaney, J., dissenting); id. at 562 (Arnold, J., with whom Smith, J. joins, dissenting); and id. at 562-567 (Bye, J., concurring in part, dissenting in part). Judge Bye's excellent concurring and dissenting opinion in Pirani thoroughly explains the

[12]As the Larry, Moe and Curly hypothetical illustrates, the majority interpretation of the applicable guideline in effect is figuratively imposing sentence on the throw of the dice – the ups and downs of the stock market. I know that sentences under the guidelines have often been subject to harsh criticism as unfair and sometimes irrational and unrealistic, but until today I did not realize that sentences can rest on the gamble of the stock market as in this case: the higher market price and gain a long time after the offense produces a greater sentence, but a lower market price and a lesser gain or a loss causes a lesser sentence. That approach for me doesn't make much sense.

problems with the standard the court has announced. I incorporate and adopt Judge Bye's opinion. I only emphasize a couple points.

As many courts have observed, the crux of the problem for conducting plain error review of Booker error is that (a) the essential question is whether the sentencing judge would have given a lighter sentence under advisory sentencing guidelines but (b) by the nature of the case, we will usually have no way of knowing.

Faced with this conundrum, this circuit has said to defendants, in effect, "tough luck," and left it at that. Worse, the court has said that the single relevant objective fact that is likely to appear in the record – namely, a sentence at the bottom of the applicable guideline range – is not enough to indicate the requisite "reasonable probability" that the sentence would be lower under advisory guidelines.

The court's willingness to apply here a doctrine that purports to resolve claims of legal error by posing a question that cannot, in the nature of the case, be answered suggests only that the court does not want to bother with most cases of unpreserved Booker error.[13]

[13]As the court's opinion in Pirani notes, some circuits have adopted the sensible approach – favored by Judges Arnold and Smith in Pirani – of simply asking the sentencing judge whether the judge would give a lower sentence under advisory guidelines. (Since Pirani was decided, the Ninth Circuit has also adopted a limited-remand approach in United States v. Ameline, 409 F.3d 1073 (9th Cir. 2005).) The Pirani court strained to justify rejecting this sensible approach. That approach is not available, the court said, because a passage of dicta in Booker is actually a binding "command." See Pirani, 406 F.3d at 552. This "command[ing]" dicta, the court said, requires us to apply *ordinary* prudential doctrines. Id. (Emphasis in original). And, the court said, *ordinary* prudential doctrines include "*the* plain error test." Id. (Emphasis in original). And asking the sentencing judge to answer an otherwise unanswerable question would, the court reasoned, not be ordinary, but would create a new plain error test to be performed by the district courts. See id. This line of reasoning puts more weight on italics than any typographical device can bear – even

## IV. CONCLUSION

For the reasons stated above, I would remand this case to the district court for further proceedings.

---

supported by the innovative concept of commanding dicta.