Criminal Case #00-365
Document 2255
Attachment #2

# Synopsis

Mooney was denied a fair trial. He had a reasonable, non-fraudulent explanation for his trades. Defense counsel was inadequate at presenting this explanation and at dealing with numerous false claims made by the prosecutor in attacking Mooney's defense. Neither the prosecutor nor the defense counsel had a good understanding of how margin accounts and employee stock options work. Because of this, the jury was never allowed to fairly consider what caused Mooney's trades.

Mooney was convicted of insider trading and related mail fraud and money laundering. There was no dispute over whether Mooney traded in United Health (United) securities after he was aware United might acquire another company. The dispute was over why Mooney traded. Did he trade to commit fraud by using insider information or were there other reasons that caused him to make the trades that he did?

According to the indictment and the jury instructions in this case, convicting Mooney required that the jury find beyond reasonable doubt that Mooney traded in order to take advantage of insider information and not for other reasons as he claimed. At trial the government gave the jury several pieces of false information that, if believed, forced the jury to conclude that Mooney's trading explanation was nothing more than a manufactured lie. This false information given by the government assured a conviction. Defense counsel did little and often nothing to object to or correct this false information.

There were two parts to the defense at trial. The first (part one) was whether Mooney actually had or received any due diligence information worth trading on. Considerable energy was spent on this question at trial and in the end the prosecutor actually conceded reasonable doubt on this issue. The second part (part two) of the defense was that Mooney actually had a reasonable, non-fraudulent explanation for the trades he made. They were caused by an unusual combination of margin problems and a company black out policy that has since been modified because it was too broad. The margin issue was bungled so badly by both the prosecutor and the defense counsel that the jury was never given a chance to accurately consider it.

**Part One (info worth trading on)**

The Mooney case was unusual for an insider trading case. It was unusual in several ways. First, Mooney traded in the company (United) that was doing the acquiring. Conventional wisdom is that the acquiring company stock price goes down, not up, when deals are made. Second, it was unusual because the stock price went up for two days when merger talks were announced and then went right back down a few days later when terms of the deal were announced. The defendant did not sell any of the securities in the two days after talks were announced and most of his securities were not sold until over three months later. Third, it was unusual because none of the four witnesses at trial who



SCANNED
MAY 28 2008
U.S. DISTRICT COURT ST. PAUL

were involved with Mooney in due diligence on the deal indicated that this transaction was going to make the stock price of United go up in the short term. Most of the information obtained in due diligence indicated that financials at Metra Health were worse than anticipated. In short, Mooney did not have any information worth trading on. The case did not turn on whether anybody had valuable trading information. The prosecutor, in his final closing, agreed that "a lot of people had a lot of reservations about the ....acquisition....People had serious reservations about this transaction." (vol. 8 page 53 lines 18-25).

The prosecutor asked for the conviction based upon how Mooney traded and when (vol. 8 page 54, lines 10-25 and page 55 lines 1-5). According to the prosecutor, the how and the when proved the why. This case turned on the timing of Mooney's trades. That is why the jury's ability to accurately assess Mooney's margin issue explanation was and is the key to this case.

**<u>Part Two – (the margin issue)</u>**

Mooney actually had a reasonable and non-fraudulent explanation for his trades but the jury was not allowed to accurately consider this. Neither the prosecutor nor the defense counsel had a thorough understanding of stock options and margin trading. Because of this, they provided the jury with inaccurate information. Included with this synopsis are documents which detail the most important false statements made at trial but here are some examples which illustrate how confused the lawyers were – obviously making it difficult for the jury to not be confused as well.

1. At the time the government decided to indict Mooney and through most (7 of 10) of the government witnesses at trial, the prosecutor did not understand what Mooney's margin account requirements were. The government thought Mooney could owe margin worth up to 65% of his account's market value but the truth was that he could only borrow margin up to 50% of market value. This is explained in the Trading Details Document included with this synopsis.

2. Besides the defendant, the court reporter and the judge, there were three people who sat in front of the jury every day. These three were arguably the three people that the jury relied on the most for accurate information. The three were the prosecutor, the FBI agent and the defense counsel. During the testimony of FBI agent Kyrilis, these three showed that they did not really comprehend how a margin account worked.

   It is simply a fact that a person cannot have a margin account with equity available to spend if they are already in a margin problem situation (margin owed is over 50% of account value). If margin owed is over 50%, then by definition the remaining value (equity) must be less than 50% and cannot be available to spend on anything. This simple fact did not deter the three "experts".

When defense counsel cross-examined FBI agent Kyrilis, he got Kyrilis to agree that Mooney was over his margin limit on April 28th (vol. 5 page 34 lines 13-23). Defense counsel and the FBI were both right on this point. Five pages of transcript later, the defense counsel got Kyrilis to agree that on April 28th and in early May there was $454,000 of equity and that it was available to spend on $213,000 worth of other items (vol. 5 page 39 lines 21-25 and page 40 lines 1-16). On this point they were both wrong. If Mooney was in a margin problem situation, he could not use any of the $454,000 on other spending. Both the defense counsel and the FBI agent were misleading the jury and probably didn't even know it.

The prosecutor, not to be outdone, thought he saw an opportunity to attack the margin problem issue and pounced on it. On the very first question of redirect, the prosecutor got the FBI agent to agree that if Mooney had $454,000 of equity in his account in early May then there couldn't have been a margin problem (vol. 5 page 41 lines 12-16).

Not only did this contradict the answer the FBI agent gave seven pages earlier, it was also false. This time the <u>prosecutor</u> and the FBI agent both misled the jury and probably didn't even know it.

3. A third example of lawyer confusion is at the very end of the prosecutor's final closing (rebuttal). The prosecutor's last major point was made for the first time, was devastating to the defense and was false. This false statement is described in the accompanying Trading Details Document. What is not pointed out in that document and the reason the statement is listed here is that the prosecutor contradicted himself within two successive paragraphs of transcript and probably didn't even realize it. On page 59, vol. 8, lines 1-14, the prosecutor told the jury that Mooney had a $110,000 margin problem on May 17th and that he could simply have exercised 17,760 employee stock options and solved the problem. What he didn't seem to realize was that <u>one paragraph earlier</u> in the transcript (vol.8, page 58, line 22) he also told the jury that Mooney <u>had</u> exercised these 17,760 shares of stock. No wonder the jury might have had trouble understanding the margin issues. If the lawyers didn't understand it, how could we expect the jury to?

4. Besides the three examples listed above, the record is also clear that neither the prosecutor nor defense counsel adequately understood or presented accurate information about the implications of United's black out policy or about the issue of "in the money" calls. These are explained further in the enclosed Trading Details Document.

5. The prosecutor defied logic again when he told the jury that the fact that Mooney went slightly over his margin limit for 4 business days starting June 14th was proof that Mooney didn't really solve his margin problem on May 17th. This is simply false – Mooney did solve his margin problem on May 17th. This is also covered in the Trading Details Document.

6. It is not relevant to an analysis of this trial but the prosecutor also gave false and misleading information to the Appeals Court. There is much trial evidence, including many statements by the prosecutor, that Mooney was significantly over his margin limit between April 19th and May 17th. In spite of this, the prosecutor told the Appeals Court (and they believed him and erroneously wrote it into their decision) that the evidence showed Mooney was never over his margin limit. The point here is not to belabor any appeal issue but simply to point out again that the government (prosecutor) information in this case can be unreliable.