Criminal Case # 00-365
Document 2255
Attachment #3

# Trading Details Document

**This document details trades made by Michael Mooney in his Recom Securities Account from March 1995 until October 1995. The document details the trades as well as background information including false statements made at trial.**

**Attached to this document are copies of 1995 Recom Monthly Statements (Gov. Exhibit 41) and a detailed analysis for the months of April through June. Also attached are Defense Exhibits 52, 53, 54 and 62 and Government Exhibit 36.**



SCANNED
MAY 28 2008
U.S. DISTRICT COURT ST. PAUL

# 1. Late March (prepare for black out)

A. In early 1995 Mooney was very leveraged into United HealthCare (United). All of his liquid assets were tied up in United stock and employee stock options. He had no savings account and owned no other stocks besides United. His checking balance was minimal. In order to hold on to as many shares of United for as long as possible he had maxed out his home equity line of credit and had also borrowed against his 401K and his automobile. He also had borrowed the maximum margin available in his stock brokerage account.

B. Mooney's stock brokerage (Recom) account was a "concentrated" account which means he held shares only in United and not in any other company.

C. Because Mooney's account was a concentrated one, the margin rules required that the margin amount owed remain below 50% of account value. If margin owed went above 50%, Mooney was required to put new shares or cash into the account or to sell shares to get it back below 50%.

Note: When the government decided to indict and go to trial it was unaware of this margin requirement or at least understood it to be different. We know this because at trial the government had its seventh of ten witnesses, the president of Recom, testify that margin owed could go up to 65% of account value (vol. 3 page 176 lines 11-12 and 23-25, page 177 lines 20-22 and page 178 lines 6-8). On cross, defendant instructed defense counsel to ask the witness about concentrated accounts. The witness revealed that Mooney had a concentrated account and that the margin requirement was actually 50% and not 65% (vol. 4 page 28 lines 1-25, also page 50 lines 2-10). **This is a crucial point – when the government was deciding whether Mooney had committed a crime and when the government was presenting most of its case at trial, the government did not understand what Mooney's margin requirements were.**

**Once the margin requirements were clarified, the government tried many times to negate the newly discovered margin issue. Because neither the prosecutor nor the defense counsel had a thorough understanding of stock options and margin trading, the jury was kept from getting accurate information from which to evaluate the margin related issues. As shown later in this report, there were several points on which the prosecutor misled the jury. The defense counsel did little and often nothing to object to or counter this misinformation.**

D. The stock price of United had been above $48 in parts of January, February and March.

E. Mooney knew in late March that a company "black out" period would begin on April 1st which would prohibit all employees from buying or selling shares for any reason until after earnings were released sometime in May. Because of that, he sold 8,500 shares on March 27th (at a stock price of $47.50). Mooney tried to follow the rules. He sold these shares in order to secure funds for two reasons. The first reason was to complete an April 1st purchase of a lot for building a new home. The second reason was to assure he was in compliance with his margin requirements when the black out period began on April 1st.

## 2. April 3rd (small margin problem appears)

A. Because of a withdrawal of funds and a drop in stock price, Mooney was over his margin limit on April 3rd. His margin owed was at 55%, about $30,000 over the allowed level. The broker typically allowed some overage and/or some time for the stock price to recover before issuing a margin call. If the stock price didn't recover within several business days, Mooney was required to take action to get the margin level back to 50% or below. **If Mooney didn't fix the problem, the broker had the right to take and sell shares – regardless of whether a formal margin call had been issued.** This was spelled out in the margin agreement (Gov. Exhibit 36 attached) and testified to by government witness Levitt (Recom owner) at trial (vol. 4 page 31, lines 19-21).

B. If there had been no company black out policy, Mooney could have easily solved his margin problem by selling some shares. He had 13,662 shares in his account. If he had been able to sell 3,662 shares, for example, his margin owed would have dropped to 38%, which would have been well below the 50% maximum requirement. This would also have prevented the April 19th margin problem described later in this report.

C. Because of brokerage rules, Mooney was required to fix his margin problem. Because of company rules (the black out) he could not sell shares. As mentioned earlier, all of his liquid assets were tied up in employee stock options and the stock in his margin account. In order to satisfy his margin requirements without selling shares Mooney had only one alternative - he was forced to exercise and hold shares of employee stock options that had been awarded six years earlier when United stock was at a very low price ($1.75 per share). Exercising and holding shares did not violate the black out policy. According to United this did not count as a trade because the exercise price was pre-determined and the shares were held and not sold.

   **Again, in order to comply with broker margin rules and company black out rules Mooney had no choice but to exercise and hold six year old employee stock options.**

**D. None of this April 3rd margin information was explained to the jury at trial.**

# 3. April 13th (small margin problem solved)

A. Mooney waited until April 13th to see if United's stock price would recover. From April 3rd to April 13th not only did the stock price not recover – it actually went down a little more (from $46.375 on April 3rd to $45.50 on April 12th). On April 12th the margin owed was at 56% and over the limit by about $35,000. On April 13th Mooney took action to solve his margin problem that began on April 3rd. He exercised and held 20,000 shares of employee stock options that had been awarded to him six years earlier.

B. Exercising and holding these 20,000 shares required that Mooney take possession of the shares and expose them to future gains or losses in the market. He was also required to declare income on most of their $917,500 value. He was required to borrow an additional $356,000 of margin in order to pay United for taxes and exercise costs (Def. Exhibit 52 attached and vol. 3 page 161 lines 11-25 and page 162 lines 1-23).

C. As a result of this exercise and hold activity, Mooney's margin problem was solved. As of April 13th he owed more margin dollars (a total of $702,776) but his percentage owed was back below 50% (46%).

**D. This April 13th margin information was not explained to the jury at trial.**

# 4. April 19th (large margin problem appears)

### A. Large Stock Price Drop

Because of negative earnings announcements by two other health insurers, United's stock price dropped about 10% (from $43.625 to $39.375) in one day (see Def. Exhibit 62 – McGuire memo – attached). At the end of April 19th Mooney's margin owed was at 58% and was about $103,000 over the allowed 50% level. The stock price did not recover within the next several business days. **By May 4th the stock price closed at $34.625 and the margin owed had gone to 66% and was $183,000 over the limit.**

### B. Had to Sell Shares

Although Mooney had solved his April 3rd margin problem by exercising and holding a six year old employee stock grant, **that solution was not possible for this margin problem**. Mooney did have some five year old option shares available but the margin problem in late April was much larger than the one in early April. The margin "gap" was about $30,000 in early April. The gap in late April was between $103,000 and $183,000. Mooney did exercise and hold his five year old grant (17,760 shares) but it only helped his margin shortage by about $40,000 – leaving him far short of solving the problem. **In order to satisfy his April 19th margin problem Mooney had no choice but to sell shares.** Both brokers confirmed this margin problem at trial, as did the April month end broker statement (Gov. Exhibit 41) attached to this report. Recom owner Levitt (vol. 4 page 44 lines 5-21) confirmed a margin problem at the end of April. Recom broker Kleckner (vol. 6 page 14 lines 5-17 also page 26 lines 1-5 also page 29 lines 8-12) confirmed this margin problem as well.

**Note: In his final (rebuttal) closing the prosecutor misled the jury on this item. He told the jury that if Mooney had exercised and held his 17,760 shares that his margin problem would be solved (vol. 8 page 59 lines 1-14). This was and still is false. In fact, Mooney did exercise and hold the 17,760 shares (Def. Exhibits 53 and 54 attached and vol. 3 page 163 lines 15-25 and page 164 lines 1-20) and it did <u>not</u> solve the margin problem. Neither the prosecutor nor the defense counsel seemed to understand that when exercising and holding shares (i.e. not selling them) only 50% of the resulting increase in market value can be used to cover margin shortage. They also did not understand that exercise costs and taxes had to be paid out of that 50%. In this case 17,760 shares were exercised and held. Their total market value was $639,360. Only 50% of that value was available ($319,680). United was paid $278,878 to cover taxes and exercise costs. The margin shortfall was $103,000 to $183,000. The amount available from the 17,760 shares to help the margin shortfall was only $40,802 ($319,680 – $278,878). The prosecutor told the jury that this transaction would improve equity by $430,000 and was an "easy solution" to the margin problem.**

**<u>This was the most crucial item in this case.</u> The single most important item to the defense was that Mooney <u>had</u> to sell shares *in early May. In his final (rebuttal) remarks to the jury the* prosecutor used false information to convince the jury to ignore Mooney's margin issue and the defense counsel did nothing to attempt to remedy or correct this false information.**

C. **Had to *Wait* to Sell Shares**

Because of the company black out policy, Mooney could not actually sell shares to satisfy his margin problem until three business days had passed after first quarter earnings were announced by United. This date ended up being May 10th. For Mooney to sell shares before May 10th would have been a direct violation of company policy.

**Note: This information was never provided to the court or to the jury by the defense counsel. The prosecutor also either didn't understand the black out issue or ignored it when he told the jury that if Mooney really had to solve his margin problem he would have done it much sooner. Three times the prosecutor told the jury that Mooney didn't really have to solve a margin problem because he had been over his limit for "throughout most of the spring… over two months…" and had done nothing to attempt to solve it (vol. 8 page 16 lines 24-25 and page 17 lines 1-17 also page 56 lines 16-25 and page 58 lines 12-15). The prosecutor ignored the fact that the April 3rd margin problem was fixed from April 13th to 19th and the fact that a new and bigger margin problem began on April 19th. He also ignored the fact that the company black out policy caused Mooney to delay selling shares to fix his problem. All three times these prosecutor closing statements were false and misleading. Defense counsel made no attempt to object to this or to clarify the facts.**

**Mooney followed the rules. The rules said Mooney had to sell shares in order to satisfy his April 19th margin problem. The rules also said Mooney had to wait until May 10th or later before he could sell the shares. Defense counsel told the jury that Mooney was required to sell shares. He did not explain that Mooney had to wait to sell the shares. The prosecutor told the jury that Mooney did <u>not</u> have to sell shares (see B and C above plus balance of this report). He also told them that Mooney ignored his margin issues for two months or more. He gave the jury false information to support his argument and the defense counsel did nothing to counter it.**

# 5. May 10th (black out ends)

A. May 10th was the date that the black out period ended and was the first date that Mooney could have sold shares to solve his margin problem without directly violating United's black out policy. On approximately May 9th, however, United informed Mooney that due diligence regarding a possible acquisition of Metra Health was going on and directed him to participate.

B. Mooney followed the rules. Because he followed the rules, he was forced into an awkward situation. Margin rules required that he sell shares of stock after April 19th. Company policy prevented him from being able to sell the shares before May 10th. Company management then put him into due diligence meetings before he was able to sell. When he did sell it would be at a significant loss in value from when he was forced to acquire the shares on April 13th, only one month earlier. A number of unpredictable events over which he had no control put Mooney into an awkward situation.

**Note: None of the black out related information was explored at trial.**

## 6. May 17th (large margin problem solved)

A. May 17th was the first day after the black out period ended that Mooney was back in town and not tied up all day in due diligence meetings and/or travel. This was before cell phones, text messaging and email were prolific. In 1995 Mooney never used any of these to communicate with Recom. On May 17th he sold the 20,000 shares that he had been forced to exercise and hold on April 13th.

B. Mooney was required by margin rules to sell shares after the stock price dropped dramatically on April 19th. He was required by United policy and actions to wait until May 17th to do so. When he sold the shares on May 17th (for about $39 per share and a total of $775,174), they were worth about $142,000 less than when they were acquired on April 13th ($917,500 and about $46 per share).

C. **Selling the 20,000 shares for about $775,000 definitely solved Mooney's margin problem. On May 17th the amount of margin owed went to zero.**

**Note; This is another crucial point. The prosecutor misled the jury on this item as well. In his closing remarks, the prosecutor told the jury that Mooney did not fix his margin problem when he sold these shares. The prosecutor told the jury that any suggestion that Mooney sold these shares in order to solve a margin problem was a "red herring" because the margin problem did not get fixed and continued after May 17th (vol. 8 page 18 lines 7-10 also page 58 lines 11-13). That was false and misleading. In fact, Mooney was below his 50% margin limit on every day from May 17th until June 14th, at which time he was over the limit for four business days because of a stock price drop (see attached Recom analysis document for more details). The defense counsel again did not object to or counter the prosecutor's false claims. All evidence shows the prosecutor was wrong. The monthly brokerage account statements (Gov. Exhibit 41 attached to this report) show that there was a major margin problem at the end of April that was fixed at the end of May. The government's own witness, the owner of the brokerage firm, also confirmed both of these facts in his testimony. Recom owner Levitt confirmed a margin problem at the end of April (vol. 4 page 44 lines 5-21). Levitt confirmed there was no margin problem by the end of May (vol. 4 page 37 lines 3-10). On top of all of this, even the government FBI witness had confirmed that the proceeds from the sale of these shares were used to reduce (solve) the margin (problem) (vol. 5 page 40 lines 17-25 also page 41 line 1 and lines 17-20). The prosecutor misled the jury and defense counsel did nothing about it.**

## 7. May 24th/May26th/June 6th/June 14th (bought calls)

A. From April 13th through May 17th Mooney was forced to expose to the market 20,000 shares of employee stock options that he had been able to hold on to for six years. He was forced first to exercise them and then later to sell them, both at a time when United's stock price was going down for reasons unrelated to United's performance. On March 31st, before the black out period began, the shares had not been exercised and their market value was about $935,000. On May 17th, Mooney was forced to sell the shares for about $775,000. Their market value had decreased by about $160,000. Mooney had no choice but to absorb that short term drop of $160,000. At that time $160,000 was about equal to an annual salary for Mooney. Mooney was also forced to borrow margin to pay taxes and exercise costs of about $356,000 that otherwise could have been delayed. More importantly to Mooney, however, was the fact that he was forced to give up the 20,000 shares and the ability to recover his "lost" $160,000 plus any possible future gains in the stock price.

In February United's stock price had been over $49. In early May it had dropped to below $35 even though United had announced record earnings for the first quarter. If Mooney believed that United's stock price would recover sometime in 1995, unrelated to whether Metra Health was acquired, there was only one way he could replace the lost value of the 20,000 shares. He could use whatever margin money he had left in the account to buy more than 20,000 shares worth of calls (at a lower price than regular shares) and recover some value if United's stock price went back up.

B. Mooney bought 40,000 shares worth of **"in the money"** calls between May 24th and June 14th. Mooney was forced to sell his 20,000 regular shares on May 17th, the first day he was back in town from due diligence meetings. Because of brokerage rules the cash from the May 17th sale was not available until May 24th. On May 24th Mooney placed an order for 20,000 shares worth of calls that would expire in January of the following year. Because the order was at a specific price, only 6,400 of the shares in that order were filled on the 24th. On May 26th the other 13,600 shares were filled. On the 26th Mooney placed another order for 20,000 shares of calls which did not fill right away. On June 6th 10,000 shares of calls were bought at a slightly higher price. On June 14th the remaining 10,000 shares were bought at a slightly higher price.

**Note: It is important in any analysis to understand that all of the calls that Mooney purchased were "in the money" calls. It turns out that neither the prosecutor nor the defense counsel understood this at trial. All of the calls that Mooney bought included the right for Mooney to purchase future shares for a "locked in" price of $35 per share. At the time he purchased the calls, United's stock price was already <u>over</u> $35. Mooney was trying to leverage his position in United but was doing it at least somewhat carefully. He was**

**hoping United's stock price would recover toward where it had been in January, February and March ($48). Even if it didn't go back up he wouldn't lose all of his investment. The best way to illustrate this is with the following facts.**

**When Mooney purchased the last calls on June 14th, United's stock price was at $40. If the stock price stayed at $40 and never went above that for the rest of the year, Mooney's calls would still be worth at least $200,000 ($40-$35 *times* 40,000 shares) vs. his original investment of $258,000 (i.e. the most he would lose would be $58,000). The prosecutor misled the jury on this item several times during the trial and the defense counsel never tried to object or correct the record.**

**In his two closing statements the prosecutor misled the jury several different times by telling them that Mooney would lose all of his $258,000 investment if United's stock price didn't go up (vol. 8 page 4 lines 13-14, also page 6 lines 8-12, also page 6 lines 15-16, also page 7 lines 6-7, also page 7 lines 10-12, also page 54 lines 16-18 also page 54 lines 21-22). He also falsely told them that Mooney used the most risky/speculative investment one can buy (in the money calls are not the most risky investment available). Defense counsel did not object to or adequately respond to these false claims.**

# 8. July 14th/October 4th/October 5th (sold calls)

A. Mooney sold 10,000 shares of the 40,000 calls on July 14th when the stock price had recovered to about $44. He sold the other 30,000 shares on October 4th and 5th when the stock price had gone back to about $48, which is where it had been in January, February and March – before the dramatic drop in April.

B. Mooney sold the last calls on October 5th. At that time, he was roughly in the same position as he would have been had he not been forced to sell his 20,000 shares in May when the price was down. This is explained in the following paragraph.

Mooney was forced to sell 20,000 regular shares in May for about $775,000. His gain from the calls was about $274,000. His total cash from these transactions was about $1,049,000 ($274,000 + $775,000). If he had simply been able to keep the 20,000 shares and not forced to sell them, their value on October 2nd would have been over one million dollars ($1,002,500 mid-day). Mooney also still would have had the 20,000 shares. He would have been able to benefit from any increase in value if United's stock price went up in the future, just like he had while holding the related stock options for the previous six years. As a matter of fact by October 24th, less than three weeks after Mooney sold the last calls, the 20,000 shares would have been worth $1,090,000 or about $40,000 more than the May sale plus the gain from the calls (the $1,049,000 described above). The point here is that Mooney's purchase and sale of calls (the government's alleged scheme to defraud) ended up putting him in about the same position financially that he would have been in if he hadn't been forced to sell his shares in May.

**Note: Mooney had a right to let the jury know that his gains from the alleged "scheme" put him in about the same financial position that he would have been in without it. The expert witness and the defense counsel did tell the jury that by October 24th Mooney would have been better off financially if he had simply held the 20,000 shares instead of selling them and trading in calls (vol 5 page 85 lines 7-18 also vol. 8 page 31 lines 20-25 and page 32 lines 1-19). The prosecutor once again misled the jury. In his final closing (rebuttal), he said these statements of the expert and the defense counsel were "just plain wrong" (vol. 8 page 52 lines 19-20). Defense counsel was inadequate at helping the jury understand that Mooney was financially no better off from the alleged "scheme" than if he had been able to not sell the shares in May.**