Criminal Case #00-365
Document 2255
Attachment #4

# Listing of False Statements

## Margin Account Issues

### Introduction

There were several margin account related false statements made by the prosecutor that were significant enough to prevent a fair trial. Each of these statements prevented the jury from being able to fairly and accurately consider the evidence. The jury was tasked with deciding whether Mooney traded for reasons of fraud or for other reasons. The jury needed accurate information in order to decide whether there was reasonable doubt about the scheme to defraud put forth by the government. Most of the margin account false statements are detailed in the "Trading Details Document" and are just summarized here.

1. The prosecutor waited until the very end of his final (rebuttal) closing to tell the jury that Mooney had a margin problem of $110,000 on May 17th but could have easily solved it by exercising and holding 17,760 shares of employee stock options. Not only was this false but the evidence showed that Mooney actually did exercise and hold these shares and it solved less than 40% of the margin problem. If the jury believed the prosecutor's false claim they were forced to reject the most important part of Mooney's defense. More information on this false statement is given in the "Trading Details Document".

2. The prosecutor told the jury that when Mooney sold the 20,000 shares on May 17th that it didn't solve his margin problem. This was false. If the jury believed the prosecutor they would have another reason to reject a key part of Mooney's defense. More information on this false statement is given in the "Trading Details Document".

3. The prosecutor told the jury to reject Mooney's margin problem explanation because Mooney had one margin problem continuously from April 3rd until May 17th and ignored it. This was false but if the jury believed it they had another reason to reject the most important part of Mooney's defense. This is covered in the "Trading Details Document".

4. The prosecutor told the jury many times that Mooney used the most risky investment possible and risked all of his $258,000 investment. This was false and could have caused the jury to reject Mooney's defense. This is covered in the "Trading Details Document".

5. The prosecutor told the jury not to consider that Mooney was in about the same position financially after his trades as he would have been in without the trades. He said this claim was "just plain wrong". This was misleading and prevented fair consideration of the evidence by the jury. This is covered in the "Trading Details Document".

6. There is one other margin account false statement that was not covered in the "Trading Details Document". The prosecutor told the jury that there was only one way that Mooney could buy calls after May 17th. He said that the only way Mooney could afford to buy calls was to sell his 20,000 shares (vol. 8 page 58 lines 2-4 and 15-16 and 23-25). This was false.

SCANNED
MAY 28 2008
U.S. DISTRICT COURT ST. PAUL

Mooney could have exercised and sold some of the 55,000 shares of employee stock options described by the prosecutor on the next page of transcript (page 59 lines 2-5) and could have bought even more shares worth of calls. Mooney also had another 13,662 of regular shares in his account that he could have sold to raise money for the purchase of calls. The prosecutor's statement was false and misled the jury.

## Other Issues

### Introduction

The following false statements are not related to margin account issues. The case might not turn on any one of these but they are listed here for another reason. Each time the prosecutor makes a false claim that contradicts the defense it undermines the credibility of every one of the defense arguments. The government, rightfully so, carries a lot of weight with juries. Juries assume, and they should, that government representatives tell them the truth. When false claims are made, the defense is unfairly undermined. The prosecutor made several other false claims at trial. The following three are the most obvious.

7. The prosecutor told the jury that this acquisition was expected to increase earnings per share because Goldman Sachs, United's advisor on the deal, said so. He said Goldman had performed analyses and that under every scenario the deal was expected to increase earnings per share (vol. 8 page 10 lines 22-25 and page 11 lines 1-3). This was false and misleading.

   Gov. Exhibit 25 was the Goldman analysis. There are several reasons the prosecutor's use of this analysis was misleading. **First of all,** Exhibit 25 was never intended to be a projection of earnings. Exhibit 25 includes over 100 total pages. In the middle of the packet are 10 exhibits (attached) that show combinations of possible prices and possible earnings. If one examines the exhibits, it becomes clear that these were actually designed to compare financing alternatives (cash versus different forms of stock) as well as goodwill amortization periods (10 year versus 20 year). The prosecutor is taking the exhibits out of context in trying to use them as evidence about a final price or earnings projection (not to mention that these were put together in April – before due diligence had begun).

   **Secondly**, these exhibits use a MetraHealth 1995 earnings range of $180 to $220 million. The record shows that on May 13th (vol. 2A, page 10, line 6 and page 11, lines 9-10 and lines 15-16) Goldman had determined that the 1995 earnings would definitely be below $200 million – they just didn't know yet how much below $200 million. That fact alone would eliminate at least 55 of the 99 combinations in Exhibit (bates) 4737 (the one the prosecutor chose to show the jury – more later). **If the earnings dropped below $180 million, every number in this exhibit would be irrelevant.** The Lehman analyst report described and included with statement #8 in this false statement summary estimated MetraHealth 1995 earnings at $120 to $150 million. The New York Times June 21st article (Gov Exhibit #97 attached) states that in the first quarter of 1995 MetraHealth earned "about 30 million" (which would be $120 million annualized).

**Third**, the evidence shows that Mooney was not aware of the Goldman projections (T vol. 3, page 46, lines 3-6).

**Fourth**, and most importantly, the prosecutor is once again cheating all of us out of an opportunity to accurately review the evidence. As mentioned above, there were ten exhibits that showed price and earnings combinations. All ten of these showed some combinations that produced decreases in the earnings per share (dilution). The prosecutor told the jury (and later the appeals court) that all analyses and every scenario showed increases in earnings per share.

The prosecutor picked one (bates 4737) of ten exhibits (which of course was the one most favorable to his point) to show. He failed to ever mention that there were nine other exhibits in the package that disproved his point. All of the 10 exhibits show dilution, including the one he used. The chart below shows how many of the 99 combinations for 1995 on each exhibit are accretive (as the prosecutor claimed) and how many are not. According to the prosecutor all of these combinations are positive (accretive). This summary shows that of the 990 total scenarios that are shown, **only 52%** (513) are **positive** (accretive). The remaining 48% (477) are actually **negative** (dilutive) or no change. The prosecutor blatantly misstated the facts.

Again – these exhibits actually do very little if anything to show whether the deal was going to be additive to earnings. How the prosecutor was successful in using these exhibits to mislead the jury (whether intentional or not) is instructive to us about how this conviction was obtained.

| ***Exhibit Bates Number*** | ***Number of Combinations Accretive*** | ***Number of Combinations Dilutive or No Change*** | ***Total 1995 Combinations*** |
|---|---|---|---|
| 4737 | 88 | 11 | 99 |
| 4738 | 27 | 72 | 99 |
| 4739 | 86 | 13 | 99 |
| 4740 | 78 | 21 | 99 |
| 4741 | 83 | 16 | 99 |
| 4742 | 65 | 34 | 99 |
| 4743 | 15 | 84 | 99 |
| 4744 | 24 | 75 | 99 |
| 4745 | 21 | 78 | 99 |
| 4746 | 26 | 73 | 99 |
| **TOTAL** | **513** | **477** | **990** |

8. The prosecutor told the jury that Wall Street and analysts loved this deal (vol. 8 page 11 lines 21-22 also page 13 lines 7-13).

The prosecutor said and/or implied that all of Wall Street and the stock analysts loved this deal and that it made their opinion of the stock go up (more favorable). This is not even close to the truth. Of all of the analysts' opinions that were published at the time of this deal, not one increased its rating for United. Some dropped their rating. Some held their rating. There was no consensus other than caution.

The prosecutor mentioned one analyst report in his closing (page 13, line 8), that of Lehman Brothers (Gov. Exhibit 32). One would assume that if the prosecution mentions only one report in its closing – that is likely the most favorable report to its position that could be found. This report is attached. The Lehman report says:

A. They are not changing their earnings estimates for United at all.
B. They are maintaining (not improving) their rating or recommendations, they maintain their rating at 2M for United stock.
C. They also refer to MetraHealth as "damaged goods" and say it will be important for United to keep the price down.
D. They mention that Sandy Weill (the seller) was tough to get a good deal from.

Also attached is a copy of government exhibit #34, which is a research report from Paine Webber published August 10, 1995. This report was skeptical of the stock and said:

A. Based on the stock's performance since the deal was announced, investor opinion is mixed at best.
B. Reaffirmed a neutral rating – "we would avoid" United at current prices.

**The prosecutor's statement that Wall Street loved the deal was wrong and therefore misleading. These reports actually support the defense argument that it was unclear to Mooney what impact this deal would have on the stock price.**

9. The prosecutor told the jury that the expert witness and the defense counsel were wrong to suggest that MetraHealth caused United's earnings and stock price to go down in 1996. He said that this claim was just another of many red herrings raised by the defense (vol. 8 page 55 lines 14-25 and page 56 lines 1-15).

The prosecutor gave his opinion that United's stock price went down because other HMO's went down. He ignores the fact that other HMO's actually went down because United did. Forget the speculation – Defense Exhibit 39 (attached) is a copy of United's own press release.

Earnings were expected to be released in August – United pre-released this information because the earnings were going to be bad. The pre-release (dated 7/11/96) said earnings are going to be bad because medical costs relative to revenues are increasing. **According to the company's own words (1st sentence paragraph 3) "The leading cause of this increase in the medical expense ratio is....MetraHealth operations".** The prosecutor's assertions were false. The expert and the defense attorney reported what United had said but the prosecutor attacked the defense as offering "another red herring".